# **EXHIBIT 1**

Case 1:24-cv-12612-IT   Document 10-1   Filed 01/31/25   Page 2 of 10

Royce-George & Associates, LLC v. U.S. Bank, N.A. as..., Not Reported in Fed....

2021 WL 294244
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

ROYCE-GEORGE & ASSOCIATES, LLC, Plaintiff,
v.
U.S. BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY BANK OF AMERICA MERRILL LYNCH TRUST 2013-C13 COMMERCIAL PASS-THROUGH CERTIFICATES, SERIES 2013-C13, and Wells Fargo Bank, N.A., Defendants.

Civil Action No. 18-cv-12198-ADB
|
Signed 01/28/2021

**Attorneys and Law Firms**

John A. Hanrahan, Royce-George & Associates, LLC, West Roxbury, MA, Richard B. Kirby, Keegan Werlin LLP, Boston, MA, for Plaintiff.

David E. Fialkow, Hollee M. Boudreau, K & L Gates LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

 **\*1** Plaintiff Royce-George & Associates, LLC ("RGA") brings this action against U.S. Bank, N.A., as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2013-C13 Commercial Pass-Through Certificates, Series 2013-C13 ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo," and, together with U.S. Bank, "Defendants"), alleging breach of contract and breach of the implied covenant of good faith and fair dealing in connection with a loan secured by a commercial real estate property in New Jersey. See [ECF No. 13 ("Am. Compl.")]. Currently before the Court are the parties' cross-motions for summary judgment, [ECF Nos. 30 (RGA's motion), 39 (Defendants' motion)]. For the reasons set forth below, RGA's motion is DENIED and Defendants' motion is GRANTED.

### I. BACKGROUND

#### A. Factual Background

Except as otherwise noted, the following facts are undisputed. [1]

RGA is a Massachusetts limited liability company, formed as a single-purpose vehicle to purchase and own a parcel of commercial real estate located at 78 Church Street in Flemington, New Jersey (the "Property"). [ECF No. 40 at 2, 15]. The Property is an approximately 11,000 square foot single-story, standalone building. [ECF No. 41-2 at 11]. RGA has three members, John Hanrahan, William Hanrahan, and John Ryan. [ECF No. 40 at 15].

In October 2003, RGA purchased the Property from Eckerd Drug Store Company ("Eckerd") and leased it back to Eckerd under a twenty-year lease set to expire in October 2023 (the "Lease"). [ECF No. 41-2 at 11; ECF No. 40 at 2, 15]. RGA financed its acquisition of the Property with the proceeds from a loan made by Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch"), which was secured by a mortgage on the Property. [ECF No. 40 at 2].

In September 2013, RGA borrowed $2.5 million from Morgan Stanley Capital Holdings, LLC ("Morgan Stanley") to pay off the Merrill Lynch loan. [ECF No. 40 at 16; ECF No. 41-2 at 11–12]. At the time, Rite Aid was operating a drugstore at the Property pursuant to the Lease. [2] [ECF No. 40 at 4]. To carry out the transaction (the "Loan"), the parties entered into a number of agreements (the "Loan Documents"). [Id. at 3]. RGA executed and delivered a ten-year $2.5 million non-recourse promissory note to Morgan Stanley (the "Note"). [3] [Id. at 4]. The Note carried a 5.34% interest rate and called for monthly payments of approximately $20,000 until September 2023, with all outstanding principal and interest due in October 2023. [ECF No. 41-2 at 108]. Assuming RGA makes all required payments, the principal balance will be $1,097,339.63 when the Note comes due in 2023. [ECF No. 40 at 13]. RGA also executed a Mortgage and Security Agreement (the "Mortgage"), granting Morgan Stanley a mortgage on the Property. [Id. at 3–4]. The Mortgage incorporates the Lease by reference, noting, among other things, that "Borrower shall not, without prior written consent of Lender, enter into, renew, extend, amend, modify, waive any provisions of, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease, including, but not limited to, the Rite Aid Lease." [ECF No. 41-2 at 140]. The parties also executed a Reserve and Security Agreement (the "R&S Agreement"), a Cash Management Agreement (the "CMA"), a Deposit Account Control Agreement (the "DACA"), and

other documents related to the Loan. [Id. at 192–233]. Subsequently, the Loan was bundled with other commercial real estate loans and sold as a commercial mortgage-backed security ("CMBS") to U.S. Bank. [ECF No. 40 at 2–3]. Wells Fargo acts as the Loan's servicer. [Id. at 5, 17].

**\*2** The Loan is collateralized by the Property and, under certain circumstances, the rent payments made by the Property's tenant. [ECF No. 40 at 16]. Pursuant to the Loan Documents, the Property's tenant makes its monthly rent payments directly into a bank account controlled by U.S. Bank. [ECF No. 40 at 17]. As servicer, Wells Fargo then uses those funds to make the monthly payments due under the Loan, disbursing any balance ("Excess Cash") to RGA. [Id. at 17–18; ECF No. 41-2 at 212–13].

This is the process until there is a "Trigger Event," as that term is defined by the R&S Agreement. [ECF No. 40 at 18]. As is relevant here, a Trigger Event "shall mean ... Rite Aid gives notice of its intention to terminate its lease early or ceases to do business open to the public at the Property...." [ECF No. 41-2 at 196–97]. After a Trigger Event occurs, the monthly payment system described above changes because having the Property vacant creates a heightened risk that the Loan will be undercollateralized (i.e., the outstanding balance and principal exceeds the value of the Property). [ECF No. 40 at 16]. Rather than being sent to RGA, any Excess Cash is deposited into an Excess Cash Reserve Account ("ECRA"), an interest-bearing escrow account controlled by U.S. Bank. [Id. at 18; ECF No. 41-2 at 196–97]. The Excess Cash continues to be deposited into the ECRA until there is a "Cash Sweep Termination," at which point RGA resumes receiving the Excess Cash each month and receives any accumulated balance in the ECRA. [ECF No. 40 at 18; ECF No. 41-2 at 196–97]. As is relevant here, according to the R&S Agreement, the following qualifies as a Cash Sweep Termination: "either a replacement tenant has entered into a new lease acceptable to Lender and is paying full rent or Rite Aid has reopened for business at the Property." [ECF No. 41-2 at 197]. If a Cash Sweep Termination does not occur, the Excess Cash continues to be placed into the ECRA until the Loan's maturity date. See [id.]. At that point, the cash in the ECRA is used to make U.S. Bank whole and, once that occurs, the remainder, if any, is disbursed to RGA. [Id. at 214].

On September 18, 2017, Rite Aid assigned its rights under the Lease to Walgreen Co. ("Walgreens"), effective February 8, 2018. [ECF No. 40 at 6, 19–20; ECF No. 41-2 at 288–95]. On July 3, 2018, RGA notified Defendants of this assignment.

[ECF No. 40 at 21]. In early July 2018, Wells Fargo became aware, and John Hanrahan confirmed on behalf of RGA, that Walgreens, which was then doing business at the Property as Rite Aid, planned to stop operating its drug store at the Property in early August 2018, but would nevertheless continue to pay rent until the Lease expired in October 2023. [Id. at 21]. Based on this information, Wells Fargo informed RGA that if Walgreens did, in fact, stop operating a business open to the public at the Property, that would qualify as a Trigger Event under the R&S Agreement. [Id.]. On or about August 7, 2018, Wells Fargo conducted a visual inspection of the Property and confirmed that Walgreens had stopped operating at the Property. [Id.]. Consequently, Wells Fargo provided RGA with a formal notice that a Trigger Event had occurred and that, pursuant to the R&S Agreement, it would begin depositing all Excess Cash into the ECRA rather than disbursing it to RGA. [4] [Id.]. Since August 2018, although Walgreens has continued to make timely rent payments, the Property has remained vacant, and Wells Fargo has therefore continued to deposit all Excess Cash into the ECRA. [Id. at 21–22].

**\*3** On or about September 7, 2018, John Hanrahan, on RGA's behalf, sent Defendants a letter requesting that they accept Walgreens as a "replacement tenant" within the meaning of the R&S Agreement. [ECF No. 40 at 11]. Defendants declined. See [id. at 22].

In November 2018, U.S. Bank transferred certain servicing rights related to the Loan to Rialto Capital Advisors, LLC ("Rialto"). [ECF No. 40 at 24]. Due to difficulties with the transfer to Rialto, an administrative error occurred whereby Wells Fargo mistakenly sent RGA a monthly statement indicating that its November 2018 debt service payment had not been made and assessing a late fee, even though the November 2018 payment had, in fact, been timely made. [Id.]. Subsequently, Wells Fargo removed the late fee, credited the November 2018 payment, reissued a monthly account statement reflecting the correction, and informed RGA, via counsel, of what had occurred, assuring RGA that a late fee would not be assessed. [Id. at 24–25]. The 2018 and 2019 year-end statements issued to RGA show no late fees, and no late fees were, in fact, ever imposed. [Id. at 25].

### B. Procedural Background

On December 13, 2018, RGA filed its six-count amended complaint, bringing claims for breach of contract against both U.S. Bank and Wells Fargo (Counts III and V, respectively),

for breach of the implied covenant of good faith and fair dealing against both U.S. Bank and Wells Fargo (Counts II and VI, respectively), for violation of the New Jersey Consumer Fraud Act ("NJCFA") against both U.S. Bank and Wells Fargo (Count IV), and for a declaratory judgment (Count I). [Am. Compl. ¶¶ 35–58]. In short, RGA alleges that Defendants have improperly withheld the Excess Cash and have improperly assessed a late fee even though RGA has timely made all its loan payments. Defendants moved to dismiss, [ECF No. 16], and the Court granted Defendants' motion in part, dismissing the NJCFA claim, [ECF No. 19]. On May 15, 2020, RGA moved for summary judgment on all remaining claims. [ECF No. 30]. On July 31, 2020, Defendants opposed RGA's motion and filed a cross-motion for summary judgment on all remaining claims. [ECF No. 39]. RGA opposed Defendants' motion on August 18, 2020, [ECF No. 42], and Defendants replied on September 1, 2020, [ECF No. 43].

**II. LEGAL STANDARD**

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.' " Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

\*4 "To succeed in showing that there is no genuine dispute of material fact, the moving party must ... 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.' " Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)). That is, the nonmoving party must set forth specific, material evidence showing that there is a genuine disagreement as to some material fact. Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

**III. DISCUSSION**

The parties agree that New Jersey law governs, [ECF No. 30-2 at 4; ECF No. 41 at 8 n.2], and the Court will therefore apply it. Borden v. Paul Reverse Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) ("Where ... the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement.").

**A. Breach of Contract**

Under New Jersey law, to succeed on a breach of contract claim, a plaintiff has the burden of proving the following four elements:

> first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."

Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016) (alterations in original) (quoting Model Jury Charge (Civil), §

4.10A, "The Contractual Claim – Generally" (approved May 1998)).

In connection with the instant motions, RGA has failed to identify with particularity, let alone provide competent evidence of, any contractual obligation that Defendants have failed to satisfy. See [ECF No. 30-2 at 10–19; ECF No. 42]. Instead, it takes a kitchen sink approach by, among other things: (1) objecting to Defendants' "literal reading" of the R&S Agreement, which RGA believes "distorts [the R&S Agreement's] logical meaning," [ECF No. 30-2 at 12]; (2) arguing that such a reading makes it impossible for RGA to bring about a Cash Sweep Termination, which would allow it to resume receiving Excess Cash, [id. at 12–14]; (3) averring that because the Loan was bundled as part of a CMBS, the Loan Documents were, in essence, a take-it-or-leave it contract of adhesion and do not reflect a bargained-for agreement, [id. at 16]; (4) highlighting the fact that RGA's members are not commercially sophisticated, [id. at 15–17]; and (5) noting that Defendants are better off financially now than they were when Rite Aid was actually operating a drug store at the Property, [id. at 18]. These arguments, however, do not support a breach of contract claim or evidence a genuine factual dispute as to whether Defendants "did not do what the contract required [them] to do[,]" Globe Motor, 139 A.3d at 64 (alterations in original), and therefore RGA's breach of contract claim cannot survive Defendants' motion for summary judgment. Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (noting that summary judgment is appropriate when the evidence is insufficient to support one party's case).

**\*5** In its amended complaint, RGA premised its breach of contract claim against U.S. Bank on U.S. Bank's alleged failure to forward the Excess Cash to RGA, [Am. Compl. ¶ 48], and its breach of contract claim against Wells Fargo on Wells Fargo's alleged improper assessment of a late fee against RGA in November 2018, [id. ¶ 56].

First, based on the undisputed facts before it, the Court finds that U.S. Bank did not breach any of its obligations under the Loan Documents by retaining Excess Cash in the ECRA instead of disbursing it to RGA. The parties agree that a Trigger Event, as defined by the R&S Agreement, occurred when Walgreens stopped operating a drug store at the Property. [ECF No. 41-2 at 20, 334]. Per the clear and unambiguous terms of the R&S Agreement, once a Trigger Event occurs, any Excess Cash must be deposited into the ECRA, as opposed to being disbursed to RGA, until there is a Cash Sweep Termination. [ECF No. 41-2 at 196–97]. Given the nature of the Trigger Event that occurred, two events could qualify as a Cash Sweep Termination: (1) "a replacement tenant [ ] enter[ing] into a new lease acceptable to [U.S. Bank] and [ ] paying full rent"; or (2) "Rite Aid [ ] reopen[ing] for business at the Property." [Id. at 197]. It is undisputed that neither has occurred. [ECF No. 40 at 21–22; ECF No. 41-2 at 334–35]. Under New Jersey law, "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and [courts] must enforce those terms as written." Kutzin v. Pirnie, 591 A.2d 932, 936 (N.J. 1991) (quoting Levinson v. Weintraub, 521 A.2d 909, 910 (N.J. Super. Ct. App. Div. 1987)). In light of the plain terms of the R&S Agreement, because a Trigger Event occurred and a Cash Sweep Termination has not yet occurred, U.S. Bank has breached no contractual obligation by continuing to deposit Excess Cash into the ECRA instead of forwarding it to RGA.

Second, the undisputed facts demonstrate that RGA was never actually required to pay a late fee. [ECF No. 41-3 at 3–4, 7; ECF No. 40 at 24–25]. Accordingly, RGA's breach of contract claim premised on Wells Fargo's alleged improper assessment of such a fee fails. [5]

Finally, RGA devotes much of its summary judgment brief to advancing an impossibility of performance argument. [ECF No. 30-2 at 12–14]. More specifically, it asserts that it cannot bring about a Cash Sweep Termination as (1) it cannot find a "new" tenant because Walgreens has an exclusive right to occupy the Property, and (2) Rite Aid cannot reopen for business at the Property because it has assigned the Lease to Walgreens. [Id.]. This argument misses the mark for two reasons.

First, as a matter of law, impossibility of performance is a defense to one's own alleged breach, not the basis for a breach of contract claim against a counterparty. JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc., 67 A.3d 702, 709 (N.J. Super. Ct. App. Div. 2013) ("A successful defense of impossibility (or impracticability) of performance excuses a party from having to perform its contract obligations...."); Armur Realty, LLC v. Banco de Brasil, S.A., No. 09-cv-02792, 2011 WL 1327422, \*4 (D.N.J. Apr. 5, 2011) ("New Jersey courts recognize the contract doctrine of impossibility of performance as a defense to breach of contract claims."); Levesque v. Becton, Dickenson and Co., No. 08-cv-00632, 2009 WL 260789, \*3 (D.N.J. Feb. 4, 2009) ("Impossibility is a defense to a claim of breach of contract, rather than the basis for an allegation of a breach."). The fact that changed circumstances purportedly rendered

RGA's performance impossible does not impose additional obligations on Defendants or in any way bear on whether they have complied with their existing ones.

**\*6** Second, as a factual matter, RGA can, in fact, bring about a Cash Sweep Termination. Pursuant to the Loan Documents, RGA is permitted to terminate the Lease with U.S. Bank's prior written consent. [ECF No. 41-2 at 140]. Accordingly, as Defendants point out, [ECF No. 41 at 12–13], there is nothing preventing RGA from obtaining U.S. Bank's consent, negotiating with Walgreens to terminate the Lease early, and finding a replacement tenant to execute a new full rent lease, which would qualify as a Cash Sweep Termination under the R&S Agreement, [ECF No. 41-2 at 197]. New Jersey courts apply the impossibility of performance doctrine when performance "has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties." JB Pool Mgmt., 67 A.3d at 709. Here, bringing about a Cash Sweep Termination is neither literally impossible nor inordinately difficult. Further, the supervening event that purportedly renders RGA's performance impossible, Walgreens' decision to shutter its store at the Property, was clearly within the "original contemplation of the contracting parties," id., given that it is one of the handful of events qualifying as a Trigger Event under the R&S Agreement, [ECF No. 41-2 at 196–97]. [6]

In sum, the undisputed facts demonstrate that (1) RGA executed Loan Documents which clearly and unambiguously set forth a procedure for what would happen if the Property's tenant closed its store, and (2) when that occurred, Defendants followed the Loan Documents' procedures. Nevertheless, RGA asserts that Defendants have breached the parties' contract because what transpired has been commercially unsatisfying. Under these circumstances, RGA's breach of contract claim cannot survive a motion for summary judgment.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." Kalogeras v. 239 Broad Ave., LLC, 997 A.2d 943, 953 (N.J. 2010) (quoting Sons of Thunder v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997)). "That is, 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]' " Id. (alteration in original) (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)). "New Jersey law also holds that a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract if that party 'acts in bad faith or engages in some other form of inequitable conduct.' " Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 170 (3d Cir. 2001) (quoting Black Horse Lane Assocs. v. Dow Chem. Corp., 228 F.3d 275, 288 (3d Cir. 2000)). Still, "the duty of good faith and fair dealing cannot alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." Hassler v. Sovereign Bank, 644 F. Supp. 2d 509, 518 (D.N.J. 2009) (quoting DiCarlo v. St. Mary Hosp., 530 F.3d 255, 267 (3d Cir. 2008)), aff'd 374 F. App'x 341 (3d Cir. 2010). The New Jersey Supreme Court has "warned that 'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive.' " Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 399 (N.J. 2005) (quoting Wade v. Kessler Inst., 798 A.2d 1251, 1260 (N.J. 2002)). "Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper. We stress that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably." Id. at 399–400 (citations and internal quotation marks omitted).

**\*7** As for the interplay between a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim, subject to limited exceptions, "breach of the implied covenant of good faith and fair dealing does not create an independent cause of action when it is based on the same underlying conduct as the breach of contract claim." Creative Concepts Mfg. Ltd. v. Team Beans LLC, No. 17-cv-06066, 2018 WL 2002800, at \*4 (D.N.J. Apr. 30, 2018) (quoting Hills v. Bank of Am., No. 13-cv-04960, 2015 WL 1205007, at \*4 (D.N.J. Mar. 17, 2015)). With regard to these limited exceptions,

> New Jersey case law has recognized the potential for such an independent cause of action based upon the covenant of good faith and fair dealing in three situations: (1) to allow the inclusion of additional terms and conditions not expressly set forth in

Case 1:24-cv-12612-IT  Document 10-1  Filed 01/31/25  Page 7 of 10

Royce-George & Associates, LLC v. U.S. Bank, N.A. as..., Not Reported in Fed....

the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance.

Barows v. Chase Manhattan Mort. Corp., 465 F. Supp. 2d 347, 365 (D.N.J. 2006) (citing Seidenberg v. Summit Bank, 791 A.2d 1068, 1077 (N.J. Super. Ct. App. Div. 2002)).

RGA argues that U.S. Bank breached the implied covenant of good faith and fair dealing by continuing to deposit Excess Cash in the ECRA even though a Cash Sweep Termination is, in RGA's view, impossible under the circumstances and that Wells Fargo breached the implied covenant of good faith and fair dealing by inappropriately assessing a late fee.[7] [ECF No. 30-2 at 7–10]. Put another way, RGA asserts that, when circumstances changed, U.S. Bank should have eschewed strict adherence to the express terms of the Loan Documents and adopted a more flexible, practical approach and by failing to do so, acted in bad faith. [Id.]. U.S. Bank responds that RGA's implied covenant claim is duplicative of its breach of contract claim, that U.S. Bank did nothing more than invoke its express rights under the Loan Documents, namely treating Walgreens' vacating the Property as a Trigger Event and depositing Excess Cash in the ECRA accordingly, and that RGA has failed to adduce any evidence of bad faith or improper motive, which is fatal to its claim. [ECF No. 41 at 14–16].

As an initial matter, U.S. Bank is correct that RGA cannot bring an independent claim for breach of the implied covenant of good faith and fair dealing where such claim is premised on the same conduct as its breach of contract claim, namely U.S. Bank continuing to deposit the Excess Cash into the ECRA. Compare [Am. Compl. ¶¶ 43–44 (alleging breach of the implied covenant based on retention of Excess Cash)] and [ECF No. 30-2 at 7 (arguing that U.S. Bank breached the implied covenant by retaining Excess Cash)], with [Am. Compl. ¶ 48 (alleging breach of contract based on retention of Excess Cash)] and [ECF No. 30-2 at 12 (arguing that U.S. Bank breached the contract by retaining the Excess Cash)].

**\*8** Further, none of the exceptions set forth in Barows apply. First, RGA has adduced no evidence that the inclusion of the additional contract term that it seeks to impose (i.e., that U.S. Bank must modify the Excess Cash provisions because of changed circumstances) is consistent with the parties' contractual expectations.[8] Second, neither party has exercised a contractual termination right. Third, whether to deposit Excess Cash into the ECRA is not a discretionary decision; U.S. Bank was contractually obligated to do so from a Trigger Event until after a subsequent Cash Sweep Termination. See [ECF No. 41-2 at 196–97 ("Commencing upon a Trigger Event ... and until a Cash Sweep Termination ... Borrower *shall* ... deposit with Lender all excess cash flow ... from the Property ... [s]uch [c]ash [f]low *shall* be deposited by Lender in an interest-bearing escrow account ... to be held by Lender pursuant to the terms of this Agreement and the other Loan Documents." (emphasis added))]. Accordingly, RGA cannot prevail on its breach of the implied covenant claim.

Even if RGA were not barred from bringing an independent claim for breach of the implied covenant, its proof would fail. To prevail, RGA would have to prove that U.S. Bank "act[ed] in bad faith or engage[d] in some other form of inequitable conduct." Emerson Radio Corp., 253 F.3d at 170 (quoting Black Horse Lane, 228 F.3d at 288). To survive Defendants' motion for summary judgment, RGA must establish a "trial-worthy issue by presenting enough competent evidence to enable" a favorable finding on that issue. ATC Realty, 303 F.3d at 94. RGA has failed to do so. In essence, RGA argues that by adhering to the Loan Documents' provisions, instead of rewriting them in light of changed circumstances, U.S. Bank acted in bad faith. But U.S. Bank did nothing more than invoke its express rights under the Loan Documents, namely, maintaining the Excess Cash in the ECRA as additional security for the Loan, and thus cannot be found to have acted in bad faith. Hassler, 644 F. Supp. 2d at 518 (noting that the covenant of good faith and fair dealing cannot be used to prevent a party from exercising express contract rights).

RGA points to the following as evidence of bad faith: (1) that U.S. Bank denied RGA the fruit of its contract while providing no meaningful benefit to itself; (2) an email from Wells Fargo to RGA referencing a "cash trap"; (3) U.S. Bank's failure to accept Walgreens as a "replacement tenant" within the meaning of the R&S Agreement; (4) the fact that Walgreens is "financially a much stronger tenant than Rite Aid"; and (5) U.S. Bank's refusal to permit RGA to sell

Royce-George & Associates, LLC v. U.S. Bank, N.A. as..., Not Reported in Fed....

Case 1:24-cv-12612-IT    Document 10-1    Filed 01/31/25    Page 8 of 10

the Property and/or refinance without incurring a penalty. [ECF No. 30-2 at 7–10]. Given the undisputed facts, however, RGA's proffered evidence is insufficient to create a question of fact on the issue of bad faith.

As to RGA's first piece of evidence, RGA's characterization is incorrect on both fronts. First, U.S. Bank did not deny RGA the fruit of its contract. When courts discuss the fruits of a contract in the context of an implied covenant, they focus on the essential purpose of the contract. See, e.g., Kalogeras, 997 A.2d at 944–45 (noting that when parties contract to transfer a liquor license, the selling party has an obligation to act in good faith to secure necessary government approval of the transfer). Here, the fruit of the contract was RGA's ability to pay off the Merrill Lynch loan. [ECF No. 40 at 16; ECF No. 41-2 at 11]. In any event, to the extent Excess Cash is a "fruit of the contract," the Excess Cash still belongs to RGA, and RGA will receive it when the Loan is paid off, minus any portion necessary to fully satisfy RGA's obligation to U.S. Bank. [ECF No. 41-2 at 197; id. at 214]. Thus, RGA cannot be said to have been deprived of the "fruit of the contract." Second, U.S. Bank did benefit: depositing the Excess Cash into the ECRA instead of paying it to RGA increases the value of U.S. Bank's collateral. Whereas before the Trigger Event, U.S. Bank could look only to the Property for recourse if RGA defaulted on the Loan, after the Trigger Event, U.S. Bank can look to both the Property and the money in the ECRA.[9]

**\*9** As to the Wells Fargo "cash trap" email, the individual from Wells Fargo who sent the email was merely using "cash trap" as a short-hand for the contractually-mandated process for depositing Excess Cash in the ECRA once a Trigger Event occurred. [ECF No. 41-2 at 297]. In any event, a single email using an ambiguous term in an offhand manner is not enough to create a genuine factual dispute regarding bad faith.[10]

U.S. Bank's refusal to accept Walgreens as a "replacement tenant" for purposes of the R&S Agreement is not evidence of bad faith. U.S. Bank's obligation to act in good faith does not require it to rewrite the Loan Documents to the benefit of RGA and there is nothing inequitable in invoking an express right under the contract. See Brunswick Hills Racquet Club, 864 A.2d at 399–400 ("Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper. We stress that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably." (citations and internal quotation marks omitted)). Along similar lines, that Walgreens is, in RGA's view, a stronger tenant is not relevant. Contractual counterparties need not share the same views and contract law does not require one party to modify contract terms to reflect the view of its counterparty.

Finally, as to U.S. Bank's refusal to allow RGA to sell the Property or refinance without penalty, U.S. Bank, like RGA, is entitled to the benefit of the bargain. Here, U.S. Bank bought a ten-year loan, with monthly loan payments of $20,215.45 until September 2023 with the balance due on October 1, 2023. [ECF No. 41-2 at 108]. Additionally, the Note sets forth a specific prepayment/defeasance process. [Id. at 110–13]. U.S. Bank did not act in bad faith by electing to receive the monthly loan payments until 2023 instead of waiving the prepayment terms in the Note and accepting a lump sum payment without penalty.

To summarize, based on the undisputed facts in the record, the chain of events was as follows. After a Trigger Event occurred, U.S. Bank began depositing Excess Cash in the ECRA in accordance with the Loan Documents. Unhappy that it was no longer receiving the Excess Cash, RGA sought to renegotiate the contract to allow it to more readily bring about a Cash Sweep Termination, which would allow it to resume receiving the Excess Cash. U.S. Bank declined RGA's invitation to renegotiate the contract terms, instead electing to maintain the Excess Cash in the ECRA until there is a Cash Sweep Termination or the Loan is paid off, as permitted by the Loan Documents. Although the Court understands RGA's frustration, apart from making decisions which RGA views as inflexible and a single ambiguous email, RGA has adduced no evidence of U.S. Bank's alleged bad faith or improper motive. Under these facts, RGA's claim for breach of the implied covenant of good faith cannot survive a motion for summary judgment.

### C. Declaratory Judgment

Because the Court has already concluded that RGA's substantive claims must be dismissed, issuing a declaratory judgment would serve no "useful purpose." See Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994). Accordingly, summary judgment in Defendants' favor will be granted on that claim as well.

### IV. CONCLUSION

**\*10** Accordingly, for the reasons discussed above, RGA's motion, [ECF No. 30], is DENIED and Defendants' motion, [ECF No. 39], is GRANTED.

Royce-George & Associates, LLC v. U.S. Bank, N.A. as..., Not Reported in Fed....

Case 1:24-cv-12612-IT    Document 10-1    Filed 01/31/25    Page 9 of 10

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 294244

---

## Footnotes

1  The Court draws the facts from Defendants' Response to Plaintiff's Statement of Undisputed Material Facts and Supplemental Statement of Undisputed Material Facts, [ECF No. 40]—which contains both parties' contentions regarding the facts set forth in support of RGA's motion for summary judgment and additional facts set forth in support of Defendants' motion for summary judgment—and the documents referenced therein. Because RGA never responded to Defendants' statement of undisputed material facts except by noting that it would stand on its own statement of undisputed material facts, [ECF No. 42 at 1], the Court deems the facts contained in Defendants' statement admitted for purposes of Defendants' motion unless they are specifically controverted by RGA's own statement of undisputed material facts, [ECF No. 30-1]. L.R. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."); see Emily Forsythe v. Wayfair, LLC, No. 20-cv-10002, 2021 WL 102649, at *1 n.1 (taking similar approach).

2  At some point between 2003 and 2013, Eckerd assigned the Lease to Rite Aid, [ECF No. 41-2 at 11], as it was permitted to do pursuant to the Lease's assignment and subletting provision, [id. at 257].

3  If a borrower defaults on a non-recourse loan, the lender's only remedy is to seize the collateral securing the loan. [ECF No. 40 at 16]. The lender cannot go after the borrower's other assets.

4  RGA concedes that a Trigger Event occurred. [ECF No. 41-2 at 20].

5  The Court also notes that RGA has pointed to no contractual provision governing late fees that Wells Fargo has allegedly breached.

6  RGA argues that the parties did not contemplate the Property's tenant closing its store but continuing to pay rent. [ECF No. 30-2 at 18–19]. That very event, however, seems to be anticipated by the R&S Agreement which references "Rite Aid ... ceas[ing] to do business open to the public at the Property," [ECF No. 41-2 at 197], as opposed to, for example, "Rite Aid ceasing to pay rent."

7  Given that no late fee was ultimately assessed, the purported assessment of such a late fee cannot form the basis for a breach of the implied covenant claim. Accordingly, RGA's claim for breach of the implied covenant of good faith and fair dealing against Wells Fargo fails, and the Court will therefore focus on the breach of the implied covenant claim against U.S. Bank.

8  To the contrary, the parties' Term Sheet, dated April 29, 2013, contemplated the same procedure ultimately embodied in the R&S Agreement, [ECF No. 41-2 at 237], which suggests that the parties' contractual expectations were consistent with the terms of the R&S Agreement.

9  As an example, if RGA does not have sufficient cash to pay the full principal and interest when the Note comes due in 2023, U.S. Bank would be able to tap into the funds held in the ECRA for full satisfaction.

10  The Court also notes that an email sent by a Wells Fargo employee does not bear on U.S. Bank's bad faith.

Royce-George & Associates, LLC v. U.S. Bank, N.A. as..., Not Reported in Fed....

Case 1:24-cv-12612-IT    Document 10-1    Filed 01/31/25    Page 10 of 10

**End of Document**                                       © 2025 Thomson Reuters. No claim to original U.S. Government Works.